UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10393-RGS |
| | ) | |
| FALCON ANDUJAR-ARIAS | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

INTRODUCTION

Falcon Andujar-Arias pled guilty on July 14, 2005 to a one-count indictment charging him with illegal re-entry of deported alien.  The Probation Department has determined his guideline sentencing range is 70-87 months.  Presentence Report (PSR) ¶ 86.  Mr. Andujar-Arias requests that the court impose a sentence of 48 months imprisonment, which is a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  United States v. Booker, 125 S.Ct. 738 (January 12, 2005).  Under the circumstances of this case which include: (1) Mr. Andujar-Arias' extraordinary **pre-arrest** rehabilitation, (2) the need to avoid unwarranted sentencing disparities because the United States Attorney's Office for the District of Massachusetts does not operate a fast-track program in illegal re-entry cases, and (3) that he will be incarcerated by ICE (formerly INS) upon completion of his sentence prior to deportation, a sentence of 48

months is reasonable, sufficient and not greater than necessary.[1]

FACTUAL BACKGROUND[2]

History and Characteristics of Defendant and Circumstances of Offense (§ 3553(a)(1)).

Falcon Andujar-Arias is a 37-year-old Dominican man who spent the early years of his life shuttling between his mother (who was only 17 when he was born) and a maternal aunt and uncle. When he was 9, he began living with his mother and her husband, who was physically abusive to both him and his mother.  He witnessed his stepfather physically injure his mother regularly. Due to his poor relationship with his stepfather, at age 13 he was sent to live with his father who owned a farm.  He was forced to "work [full-time] like mule" and was therefore unable to keep up with his schoolwork.  Because his father did not value education, Andujar-Arias left school after the seventh grade.[3] He worked on the farm for 5 years until his father died of a heart attack.  He was 17.  Following his father's death, he moved to Santo Domingo and worked for a year in a casino before coming

_____

[1]Andujar-Arias was arrested by ICE agents on November 22, 2004 and held in the custody of Immigration until he was released to the custody of U.S. Marshals and brought to the United States District Court for the District of Massachusetts on December 23, 2004.

[2]The historical background and facts are taken from the PSR.

[3]Many years later, while serving his one state prison sentence, Andujar Arias studied for and passed the G.E.D. exam.

-2-

to the United States to rejoin his mother who had immigrated to Peabody, MA.  PSR 50.

Mr. Andujar-Arias began using marijuana after he was sent away to work for his father.  PSR 69-70.  By the time he was 15 and was no longer attending school, he was smoking "all day long, everyday."  PSR 70.  He became addicted to crack and cocaine when he was 18 and continued using them until he was arrested in 1993. Andujar-Arias was deported on March 9, 1996.  Approximately two years later, he returned to the United States and began using the name Dwight Braswell.  By 1999, his drug problem had progressed to an uncontrollable addiction to heroin.  The PSR indicates that he had three convictions for street level heroin dealing between April 1999 and November 2000.  PSR 35-37.  In April 2001, Mr. Andujar-Arias made a decision to change his life and pro-actively began to conquer his drug addiction.  As a result, for the four years between November 11, 2000 until November 22, 2004 (the date of his arrest in the present case), Andujar-Arias had no further drug related arrests and was not incarcerated.

On April 2001, Andujar-Arias voluntarily signed himself into a seven day detox program at Caritas Hospital in Norwood.  See treatment records filed separately under seal.  There he began the long, arduous task of overcoming his addiction to heroin and remaining drug free.  At the time of his arrest in the present case, Andujar-Arias had been sober for approximately two years. He successfully completed a detox program, joined a long term

outpatient program which involved weekly meetings, and moved into
a 12-step program for recovering addicts where he remained for
about 5 months.  PSR and attached records.  In the spring of
2003, he took the difficult step of moving out of the sober house
and into the community.  He then chose to join "The Church of the
Living God" in Woburn.  See letter of Pastor James Hicks
(attached as A) and letter of church members (attached as B).
Andujar-Arias has remained a dedicated, active member of his
church, participating in tithes, assisting in clean-up and
maintenance, and serving in church activities for over a year and
a half.

It was through his church that Andujar-Arias met his future
employer, Brian Bilowz, who owns Restore-Pro, Inc., a small
business doing floor repair work.  He worked full time for
Restore-Pro, Inc. for over a year and a half until his arrest in
the present case.  See letter of Brian Bilowz (attached as C).
Although he did not disclose his true name, he did confess to his
employer and his pastor his past as a drug addict and drug
dealer.  Id.  His employer described Andujar-Arias as someone who
was "extremely loyal, trustworthy, and hardworking" who "never
drank or stole" and "was faithful as an employee and a member of
our church."  Id.  Pastor James Hicks describes Andujar-Arias as
someone who has genuinely changed his attitude and conduct and
who's "heart's desire is to live a good upright life."

-4-

ARGUMENT

I.    Two years is the applicable statutory maximum
      under 8 U.S.C. § 1326.

      A.    The defendant was not indicted for, nor did
            he plead guilty to, being deported after
            having been convicted of a felony.

      Mr. Andujar-Arias was charged with violating 8 U.S.C.

§ 1326(a), "Illegal Re-entry of Deported Alien."  The indictment

alleges that he, "being an alien and having been excluded,

deported and removed from the United States..." was found here,

"in violation of Title 8, United States Code, Sections 1326(a)(1)

and (b)(2) and Title 6, United States Code, Sections 202(3) and

(4) and Section 557."  The indictment does not allege his prior

conviction of any crime.

      On July 14, 2005, the defendant pled guilty before this

Court.  At the hearing, the defendant did not admit to any fact

pertaining to any prior criminal conviction.  See portion of

transcript of change of plea pp. 11 and 20 (attached as D).

      B.    This Court should find that the defendant
            cannot be sentenced under 18 U.S.C. §1326(b)(2)
            and should sentence him under subsection (a)
            to no more than two years.

            1.    The Almendarez-Torres decision.[4]

---

      [4]Counsel recognizes that the First Circuit has ruled that
Almendarez-Torres remains binding and that it must apply until
overruled by a majority of the Supreme Court, United States v.
Ivery No. 03-2496, slip op. at 14-15 (1st Cir. 2005), but raises
this issue to preserve it for further review and for adjudication
should the Supreme Court expressly overrule Almendarez-Torres.

8 U.S.C. § 1326(a) states that an alien who is deported and
reenters shall be imprisoned not more than two years.  Section
1326(b)(2) raises the statutory maximum to twenty years for an
alien "whose removal was subsequent to a conviction for
commission of an aggravated felony."  The statute does not set
out the manner or standard of proof required to support the ten-
fold increase in the statutory maximum, although the statute does
require findings regarding the class of the conviction, the
timing relative to removal, and the characteristics that make a
felony aggravated under 8 U.S.C. § 1101(a)(43).

In <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998),
the defendant, having admitted in his guilty plea colloquy that
his deportation "had taken place 'pursuant to' three earlier
'convictions' for aggravated felonies," argued that the Fifth
Amendment required the prior felony convictions to be charged in
the indictment.  <u>Id</u>. at 227.  The Court, in a five to four
decision, held that subsection (b)(2) is

> a penalty provision, which simply authorizes a court to
> increase the sentence for a recidivist.  It does not
> define a separate crime.  Consequently, neither the
> statute nor the Constitution require the Government to
> charge the factor that it mentions, an earlier
> conviction, in the indictment.

<u>Id</u>. at 226-227.

In his dissent, Justice Scalia wrote that "the text of the
statute supports, if it does not indeed demand, the conclusion
that subsection (b)(2) is a separate offense that includes the

violation described in subsection (a) but adds the additional element of prior felony conviction." <u>Id</u>. at 250.  He criticized the majority's ruling that it was constitutionally permissible for "a defendant's sentencing exposure to be increased tenfold on the basis of a fact that is not charged, tried to a jury, and found beyond a reasonable doubt." <u>Id</u>. at 260.  He questioned why recidivism should be an exception to the rule that a fact which increases maximum permissible punishment must be found by a jury beyond a reasonable doubt:  "[T]here is no rational basis for making recidivism an exception." <u>Id</u>. at 257-258 [emphasis in original].  He concluded that under the doctrine of constitutional avoidance, the Court should have construed section (b)(2) as defining a separate offense that must be charged and proven. <u>Id</u>. at 271.[5]

       2.  <u>Almendarez-Torres is no longer good law</u>.

_____ Cases decided after <u>Almendarez-Torres - Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), <u>Blakely v. Washington</u>, 125 S.Ct. 2531 (2004), <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and <u>Shepard v. United States</u>, 125 S.Ct. 1254 (2005) - establish that the Sixth Amendment requires factors that increase statutory maximums to be

---

[5]"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988).

charged and either proved beyond a reasonable doubt to a fact-finder or admitted as part of a guilty plea.  Although the Court has continued to mechanically cite the irrational "exception" to this rule carved out by <u>Almendarez-Torres</u>, according to which prior convictions are the only facts increasing statutory maximums that do not need to be charged and proved, a majority of the Court believes that <u>Almendarez-Torres</u> was wrongly decided.  Under the reasoning of these cases, <u>Almendarez-Torres</u> is no longer good law.  This Court should utilize the doctrine of constitutional doubt to find that the statute under which the defendant is charged sets out a separate crime in subsection (b)(2).  Therefore, since the defendant was not charged, and did not plead guilty to, the predicate conviction, he cannot be sentenced under that section.[6]

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

---

[6]The Supreme Court stated long ago the "one [rule of] universal application, - that every single ingredient of the offence must be accurately and clearly expressed; or, in other words, that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." <u>United States v. Reese</u>, 92 U.S. 214, 232 (1875) (Clifford, J., concurring).  This long-standing precedent, solid law before <u>Almendarez-Torres</u>, and upheld in case law since <u>Almendarez-Torres</u>, indicates that <u>Almendarez-Torres</u> is an invalid deviation from the common law and constitutional requirement that all the ingredients necessary for punishment be alleged in an indictment.  As the defendant was not indicted for having a specific conviction under 8 U.S.C. § 1326(b)(2), he cannot now be punished for it.

statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt." While affirming the questionable holding of

Almendarez-Torres, the Court tightly limited that case to its

facts, noting that Almendarez-Torres "represents at best an

exceptional departure from the historic practice [of requiring

pleading and proof of factors increasing statutory maximums]."

530 U.S. at 484, 487. The Court emphasized that no question

regarding jury trial or standard of proof arose in Almendarez-

Torres and explicitly noted that Almendarez-Torres may have been

incorrectly decided and should be narrowly applied. Id. at 488-

489. The Court's lack of confidence in Almendarez-Torres was

undoubtedly reinforced by the defection of Justice Thomas, who

authored a concurring opinion renouncing his swing vote in

Almendarez-Torres. Apprendi, at 520-21 (Thomas, J., concurring).

In Ring, the Court addressed the inconsistency between

Apprendi and Walton v. Arizona, 497 U.S. 639 (1990), in which the

Court had upheld fact finding by a judge concerning sentencing

factors predicate to a death sentence. The Court found that

evolving constitutional litigation undermined Walton, and

overruled that case. The Court specifically quoted Justice

Thomas's concurring opinion in Apprendi, in which he asserted

Almendarez-Torres was wrongly decided:

> [I]f the legislature defines some core crime and then
> provides for increasing the punishment of that crime
> upon a finding of some aggravating fact [,] ... the
> core crime and the aggravating fact together constitute
> an aggravated crime, just as much as grand larceny is

> an aggravated form of petit larceny.  The aggravating
> fact is an element of the aggravating crime.

Ring, 536 U.S. at 605 (quoting Apprendi, 530 U.S. at 501 (Thomas,
J., concurring)).  In reversing Walton, the Court stated:
"Because Arizona's enumerated aggravating factors operate as 'the
functional equivalent of an element of a greater offense,'
Apprendi, 530 U.S. at 494 n.19..., the Sixth Amendment requires
that they be found by a jury."  Ring, 536 U.S. at 609.

In Blakely and Booker, the Court held that increases in
mandatory guidelines punishment implicated Sixth Amendment
rights, but nevertheless quoted Apprendi in excluding "the fact
of a prior conviction" from its holding that any fact increasing
the penalty for a crime beyond the prescribed statutory maximum
must be found by a jury beyond a reasonable doubt or admitted to
at a guilty plea.  Blakely, 124 S.Ct. 2536; Booker, 125 S.Ct. at
747.  By the time of the Shepard decision, however, five months
after Booker, Justice Thomas openly questioned why the Court
adhered to the rule of Almendarez-Torres, "which draws an
exception to the Apprendi line of cases for judicial fact finding
that concerns a defendant's prior convictions."  Shepard, 125
S.Ct. at 1264.  Concurring, Justice Thomas stated that

Almendarez-Torres

> has been eroded by this Court's subsequent Sixth
> Amendment jurisprudence, and a majority of the Court
> now recognizes that Almendarez-Torres was wrongly
> decided [citation omitted].  The parties do not request
> it here, but in an appropriate case, this Court should
> consider Almendarez-Torres' continuing viability.

-10-

> Innumerable criminal defendants have been
> unconstitutionally sentenced under the flawed rule of
> <u>Almendarez-Torres</u>, despite the fundamental "imperative
> that the Court maintain absolute fidelity to the
> protections of the individual afforded by the notice,
> trial by jury, and beyond-a-reasonable-doubt
> requirements."

<u>Id</u>. at 1264, quoting <u>Harris v. United States</u>, 536 U.S. 545, 581-582 (2002) (Thomas, J., dissenting).

In short, the "breadth of the holdings" in the recent cases cited "have in fact overruled" Almendarez-Torres. <u>Cf</u>. <u>United States v. Malouf</u>, 2005 WL 1398624 (D.Mass.) (<u>Booker</u> and <u>Blakely</u> have in fact overruled <u>Harris</u>). This Court should find that 8 U.S.C. § 1326(b)(2) sets out a separate crime that was neither charged nor admitted to by the defendant. Therefore Mr. Andujar-Arias can only be sentenced, under subsection (a), to a maximum of two years.

       3.    <u>Even if Almendarez-Torres survives,</u>
            <u>it does not apply to this case</u>.

The Court in <u>Almendarez-Torres</u> addressed only the indictment clause of the Fifth Amendment. The defendant admitted during the plea colloquy that his deportation "had taken place 'pursuant to' three earlier 'convictions' for aggravated felonies." <u>Almendarez-Torres</u>, 523 U.S. at 227. The Court there expressly disavowed any holding regarding the manner and standard of proof required to establish the prior aggravated felony. <u>Id</u>. at 248. Here, Mr. Andujar-Arias did not plead guilty to having the predicate conviction under subsection (b)(2). Attachment D at

-11-

pp. 11 and 20.  Accordingly, even assuming the continuing vitality of <u>Almendarez-Torres</u> as a statement of Fifth Amendment law, sentencing him to more than two years violates his Sixth Amendment rights under <u>Apprendi</u>, <u>Blakely</u>, and <u>Booker</u>.

Moreover, the current version of 8 U.S.C. § 1326 differs from that addressed in <u>Almendarez-Torres</u>.  The statute at issue in <u>Almendarez-Torres</u> was simpler:  former section 1326 included no reference to removal and created two simple categories of aliens "whose deportation was subsequent to a conviction for commission of a felony (other than an aggravated felony)" and "whose deportation was subsequent to a conviction for commission of an aggravated felony."  8 U.S.C. § 1326(b)(1) and (2) (1988). In addition, the definition of "aggravated felony" under 8 U.S.C. § 1101(a)(43) was less complex than at the time of the <u>Almendarez-Torres</u> decision.  In 1988, the initial definition included only murder, drug trafficking, and weapons trafficking. Pub. L. No. 100-690, § 7342, 102 Stat. 4469, 4469-70.  In 1990, the definition expanded to include crimes of violence for which a term of at least five years imprisonment was imposed. Immigration Act of 1990, Pub. L. No. 101-649, § 501, 104 Stat. 4978, 5048.  In 1996, after Mr. Almendarez-Torres' guilty plea, the definition was expanded to cover dozens of potential offenses depending on various characteristics of the offense.

8 U.S.C. § 1101(a)(43) (2000).[7]

To increase the statutory maximum, 8 U.S.C. § 1326 now requires findings regarding the class of the conviction, the timing relative to removal, and the characteristics that make a felony aggravated under 8 U.S.C. § 1101(a)(43).  However, the statute does not explicitly set out the manner or standard of proof for the increase in the statutory maximum.  Compliance with the mandate of Apprendi and its progeny require that those facts - facts beyond the mere fact of prior conviction - be proved beyond a reasonable doubt or admitted by the defendant.  That has not been done here.

In sum, Almendarez-Torres does not apply here because unlike that case, Mr. Andujar-Arias did not admit as part of his plea that he had the necessary conviction to raise the statutory maximum to twenty years.  Under the present statute, the proof concerning the prior conviction is complex and the Court cannot assume the facts necessary to that finding.  Not having waived his Sixth Amendment rights to proof of the conviction,

---

[7]Some of the offenses involve factors that would not be included in either a judgment or charging documents, such as the amount of loss (8 U.S.C. § 1101(a)(43)(D) and (M)), the purpose of assisting a family member (8 U.S.C. § 1101(a)(43)(N) and (P)), and factors classifying crimes as "crimes of violence" and drug trafficking crimes.  See James P. Fleissner and James S. Shapiro, Sentencing Illegal Aliens Convicted of Reentry After Deportation: A Proposal for Simplified and Principled Sentencing, 8 SENT. RPTR. 243 (March/April 1996) (the tortuous amendment process has increased the complexity of determining what is an "aggravated felony").

Mr. Andujar-Arias cannot now be punished under the twenty year maximum.

II. <u>Sentencing factors to be considered under 18 U.S.C. § 3553</u>.

Under the Supreme Court's decision in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005) a court must look to 18 U.S.C. § 3553(a), and impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2).  <u>Booker</u> 125 S.Ct. at 764-65.  In imposing sentence, the Court must consider all of the factors set forth in § 3553(a)(1)-(7).  The sentencing guidelines are no longer binding on the court.  <u>Id</u>.

A.    <u>The Sentencing Guidelines and "any pertinent policy statement"(§ 3553(a)(4) & (5))</u>.

Extraordinary Pre-arrest Rehabilitation

The probation department has determined Mr. Andujar-Arias' sentencing range to be 70-87 months.  However, under a sentencing guideline analysis, **prior to his arrest**, Mr. Andujar-Arias has demonstrated rehabilitative efforts and progress so significant, and so far exceeding ordinary expectations, as to warrant downward departure.  Under the First Circuit decision in <u>United States v. Sklar</u>, 920 F.2d 107 (1st Cir. 1990), a departure ground can exist for rehabilitative efforts made by a defendant even after his arrest.  <u>See also</u> <u>United States v. Craven</u>, 239 F.3d 91, 100 (1st Cir. 2001) ("The touchstone of rehabilitation is a fundamental change in attitude.").

-14-

The ground for departure based on extraordinary presentence rehabilitation is set forth in United States v. Sklar. 920 F.2d 107 (1st Cir. 1990):

> We continue to believe that, in an appropriate case, a defendant's presentence rehabilitation efforts and progress can be so significant, and can so far exceed ordinary expectations, that they dwarf the scope of presentence rehabilitation contemplated by the sentencing commissioners when formulating section 3E1.1. We hold, therefore, that a defendant's rehabilitation might, on rare occasion, serve as a basis for downward departure, but only when and if the rehabilitation is "so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction." Studley, 907 F.2d at 259.

United States v. Sklar, 920 F.2d 107 (1st Cir. 1990). See also United States v. Bradstreet, 207 F.3d 76 (1st Cir. 2000) (departure affirmed based on defendant's extraordinary efforts toward rehabilitation, including community service and efforts at educating his fellow inmates). Other courts concur. See, e.g., United States v. Newlon, 212 F.3d 423, 424 (8th Cir. 2000) (downward departure granted based on atypical rehabilitative efforts); United States v. DeShon, 183 F.3d 888 (8th Cir. 1999) (downward departure affirmed where the manner and conduct of defendant's life had changed, and his post-offense rehabilitation efforts were exceptional); United States v. Jones, 158 F.3d 492, 502-504 (10th Cir. 1998) (downward departure affirmed in case of possession of a firearm by a prohibited person, where the defendant adhered to the conditions of release and changed both his attitude and conduct during his release, constituting

-15-

exceptional post-offense rehabilitation); United States v. Workman, 80 F.3d 688 (2d Cir. 1996) (departure affirmed for rehabilitation achieved in leaving life as a gang member, joining the army and completing his military service honorably); United States v. Ramirez, 792 F.Supp. 922 (E.D.N.Y. 1992) (aberrant act in conjunction with "strong efforts to lead a decent life in a poor environment", enrollment in college at time of arrest and change of living circumstances merited downward departure). Sklar, 907 F.2d at 259 citing to United States v. Studley, 907 F.2d 254, 259 (1st Cir. 1990). See also United States v. Bradstreet, 207 F.3d 76 (1st Cir. 2000) (departure affirmed based on defendant's extraordinary efforts toward rehabilitation, including community service and efforts at educating his fellow inmates). See, e.g., United States v. Newlon, 212 F.3d 423, 424 (8th Cir. 2000) (downward departure based on atypical rehabilitative efforts); United States v. Akin, 62 F.3d 700, 702 n.3 (5th Cir. 1995) (five circuits allow for departure for extraordinary presentence efforts at alcohol or drug rehabilitation); United States v. Maier, 975 F.2d 944, 946-49 (2nd Cir. 1992) (affirming downward departure, noting the distinction between drug dependence and a defendant's sincere efforts to conquer such dependence).

Mr. Andujar-Arias illegally reentered the United States in 1998. At that time he was in the throes of an out-of-control heroin addiction. In 2001 he forced himself to get help and to

follow through with treatment.  See treatment records, filed

separately under seal.  While initially he had some setbacks, by

the time of his arrest he had been clean and sober for two years.

Throughout that period, he has maintained employment and been

active in his church.  He has become a positive force in his

community as well as with other recovering addicts.  As is well

documented, Andujar-Arias' rehabilitation has been remarkable and

requires a substantial downward departure in the calculations

under the Sentencing Guidelines.  It is particularly remarkable

here because Mr. Andujar-Arias undertook the rehabilitation of

his own accord prior to his arrest.

> B.   The "need to avoid unwarranted sentence
>      disparities among defendants with similar records
>      who have been found guilty of similar conduct"
>      (§ 3553(a)(6)).

Fast-Track Disparity

One of the factors <u>Booker</u> directs courts to consider in

sentencing is 18 U.S.C. § 3553(a)(6), "the need to avoid

unwarranted sentence disparities" among similarly-situated

defendants.  Fast-track programs undermine the goal of uniformity

in sentencing by creating serious sentencing disparities in

illegal reentry cases.  As a result of these fast-track programs,

defendants receive vastly different sentences based not on their

own individual characteristics, but on the random location of

their arrest.  Because the United States Attorney's Office for

the District of Massachusetts does not operate a fast-track

program, defendants in this district receive significantly higher
sentences than defendants in other districts.[8]  The only way to
reduce these disparities is to lower the sentences for illegal
reentry defendants in jurisdictions without fast-track programs
so that they are similar to sentences defendants in fast-track
jurisdictions receive.

In 2003, Congress adopted the Prosecutorial Remedies and
Other Tools to end the Exploitation of Children Today Act of
2003, otherwise known as the "PROTECT Act."  Section 401(m)(2)(B)
of the PROTECT Act directed the Sentencing Commission to
promulgate, pursuant to 28 U.S.C. § 994:

> (B) a policy statement authorizing a downward departure
> of not more than 4 levels if the Government files a
> motion for such departure pursuant to an early
> disposition program authorized by the Attorney General
> and the United States Attorney ....

Pub.L. 108-121, § 401(m)(2)(B).  The Sentencing Commission did
so, adopting the following policy statement in October 2003.

U.S.S.G. § 5K3.1.  Early Disposition Programs (Policy Statement):

> Upon motion of the Government, the court may depart
> downward not more than 4 levels pursuant to an early
> disposition program authorized by the Attorney General
> of the United States and the United States Attorney for
> the district in which the court resides.

---

[8]For example the United States Sentencing Commission's
October 2003 Report to Congress, Downward Departures from the
Federal Sentencing Guidelines showed that in 2003 there were zero
government initiated departures in immigration cases in
Massachusetts versus 59% in Arizona and 18.9% nationally.  See
portion of 2003 report attached as "E".

The purpose of these programs is to facilitate prompt and
easy disposition of illegal reentry cases to reduce the burden
they impose in those districts.  United States v. Melendez-
Torres, 420 F.3d 45, 52 (1st Cir. 2005).  In other words, "there
was not enough space to house detained defendants, and there were
not enough prosecutors to handle all the cases brought to them."
United States v. Medrano-Duran, 386 F.Supp.2d 943, 946 (N.D. Ill.
August 11, 2005).  "[T]hese programs are authorized only when
they are clearly warranted by local conditions within a
particular district."  Memorandum from Attorney General
John Ashcroft to All Federal Prosecutors, "Department Policy
Concerning Charging and Prosecuting of Criminal Offenses"
(Sep. 23, 2003) attached as "F".

Fast-track programs authorized by the Attorney General for
illegal re-entry cases exist in thirteen districts, many of which
are in the southwestern border states; the District of Arizona,
the Northern, Eastern, Central, and Southern Districts of
California, the District of New Mexico, the Southern District of
Texas, and some divisions of the Western District of Texas.
United States v. Medrano-Duran, 386 F.Supp.2d 943, 946 (N.D. Ill.
August 11, 2005).  However the Attorney General has also approved
early disposition programs in other districts, specifically the
Districts of Oregon, Idaho, Nebraska, North Dakota, and the
Western District of Washington.

The issue to be determined is whether the gross disparity between sentences in fast-track versus non-fast-track jurisdictions is "unwarranted" within the meaning of § 3553(a)(6).  Weight must be given to Congress' directive to the Sentencing Commission to create a policy allowing for early disposition programs authorized by the Attorney General.  See United States v. Martinez-Flores, 428 F.3d 22, 30 (1st Cir. 2005) (finding no plain error where district court gave no indication that it would have considered any fast-track disparities "unwarranted").  If the only disparities were those created by fast track programs of the type that Congress intended in the PROTECT ACT, arguably, they might not be "unwarranted."  Medrano-Duran, 386 F.Supp.2d 943 at 946.  However, because there are a significant number of districts with fast-track disposition programs that operate outside the bounds of the PROTECT act and U.S.S.G. § 5K3.1, the disparities are therefore clearly unwarranted.

According to government submissions in the case of Medrano-Duran:

> [T]here are two distinct types of fast track programs: those which, consistent with § 5K3.1 and the Congressional directive, rely on downward departures of up to four levels, and those which rely on charge-bargaining, in other words, where the defendant is permitted to plead guilty to a reduced charge.
>
> The fast track districts that rely on charge-bargaining use methodologies that permit far greater sentence reductions than contemplated by Congress' directive in

-20-

the PROTECT Act and the Sentencing Commission's policy statement in § 5K3.1. In at least five of the fast track districts (the Northern, Central, and Southern Districts of California, the District of Oregon, and the Western District of Washington), persons charged with illegal reentry under 8 U.S.C. § 1326 are permitted to plead guilty to two counts of improper entry under 8 U.S.C. § 1325. The effect is to limit the sentence to thirty months' imprisonment: the first offense under § 1325 carries a six month maximum prison sentence, and the second offense carries a twenty-four month maximum.

Medrano-Duran, 386 F.Supp.2d 943 at 946-947. Thus, charge-bargaining in these districts can result in a reduction that significantly exceeds that which a defendant would receive if limited to the four-level maximum departure authorized by Congress or by the Sentencing Guidelines.

In addition, unwarranted disparities exist because fast-track programs are not limited to districts that are overwhelmed by illegal reentry cases as was intended by Congress. Rather, the Attorney General has approved fast track programs in districts in which each Assistant United States Attorney handles only 2-3 illegal reentry cases a year. (Oregon, Idaho, Nebraska, and North Dakota). In the Western District of Washington, which now has a fast-track program, there are 0.58 illegal reentry cases per Assistant U.S. Attorney. Id. Medrano-Duran, 386 F.Supp.2d 943 at 948.

Because unwarranted disparities exists between Andujar-Arias and similar defendants who have committed identical crimes, he should receive a sentence commensurate with those defendants.

<u>CONCLUSION</u>

For the foregoing reasons, Falcon Andujar-Arias requests the Court impose a sentence of 48 months imprisonment.

FALCON ANDUJAR-ARIAS
By his attorney,

/s/ Catherine K. Byrne

Catherine K. Byrne
  B.B.O. #543838
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: 617-223-8061

November 23, 2005

-22-

# EXHIBIT
# A

# Church of the Living God
## 205 Cambridge Road
## Woburn, MA 01801

"The pillar and
foundation of
the Truth."

*Jesus
is
Lord!*

*James R. Hicks* PASTOR

*Telephone:* (781) 935-1355

**June 16, 2005**

**Honorable Judge Richard Stearns:**

**I am writing this concerning "Falcon Andujar".**

**Falcon first came to my church in the Spring of 2003. During his time here, I found him to be a genuine blessing. He was always willing to help and did so in numerous chores and activities. He was always cheerful and friendly to everyone, a very likeable individual.**

**I have come to realize that Falcon was struggling with a guilty conscience while here because of concealing his identity. He has told me that he is relieved that the truth of his identity was exposed. I am certain that Falcon has become a true believer in Jesus Christ and that his heart's desire is to live a good and upright life. I hope that he may be shown mercy in the judicial system.**

**Sincerely,
James R. Hicks**

# EXHIBIT
# B

# Church of the Living God
## 205 Cambridge Road
## Woburn, MA 01801

"The pillar and foundation of the Truth."

Jesus is Lord!

James R. Hicks  PASTOR                    Telephone: (781) 935-1355

**June 16, 2005**

**Honorable Judge Richard Stearns:**

**We the undersigned members of the Church of the Living God also wish to affirm their support for Falcon Andujar.**

**Falcon first came to my church in the Spring of 2003. During his time here, I found him to be a genuine blessing. He was always willing to help and did so in numerous chores and activities. He was always cheerful and friendly to everyone, a very likeable individual.**

**I have come to realize that Falcon was struggling with a guilty conscience while here because of concealing his identity. He has told me that he is relieved that the truth of his identity was exposed. I am certain that Falcon has become a true believer in Jesus Christ and that his heart's desire is to live a good and upright life. I hope that he may be shown mercy in the judicial system.**

**Sincerely,**

**The undersigned members of the Church of the Living God.**

*[Signatures of the undersigned members]*

# EXHIBIT
# C

# RESTOREPRO INC.

52 DRAGON COURT
UNIT 2A
WOBURN, MA 01801
800 - 847 - 0114

August 1, 2005

To: The Honorable Judge Richard Stearn
Re: Falcoln Andujar

Dear Sir,

I am writing this letter on behalf of Falcoln Andujar. I have known Falcoln Andujar for over 2 years now. I knew him as Dwight Braswell.

I met Falcoln in our church where he began coming in 2003. He became my employee and also moved into a house me and some other members of our church were renting.

I found Falcoln to be very dedicated to our church and his job. I became close friends with him and never had any problems with him. He was extremely loyal, trustworthy, and hardworking. I have known many people and have had over 80 employees since I started my company. I have had many dishonest people, people "out just for themselves", This is not Falcoln.

In all the time I have known him, I found him to be very upright in all his actions. He was proper to women, never swore (except by mistake and he would always correct himself), never drank, or stole. He was faithful as an employee, and member of our church.

I knew he had a rough past he had often confessed his past as a drug addict, a drug dealer, and criminal. I didn't however know that he was living here under a false name.

I completely believe that he kept his true identity hidden because he felt trapped. He was burdened with the responsibility of supporting his family back home.

I am convinced that his happiest freest day in America was the day he was arrested. I know that he has changed for the good, although he can't change the past, I'm sure avoiding trouble and doing what is right is all he wants to do.

If I can be of any assistance or if you have any questions for me please call me anytime at 781-760-2925

Sincerely,

Brian Bilowz

# EXHIBIT D

judges brought to sentencing matters.

My practice, which I think is similar to the way
most judges now are interpreting the Supreme Court's
directions in this regard, is to look first to the
Guidelines. I think that's what the Court wants me to do,
and in a given case ask myself whether, in fact, the
Guideline result is a reasonable one. If it is, then I
think the Supreme Court is counseling me to sentence under
the Guidelines.

If, for whatever reason, I find that the sentence
that the Guidelines recommend is unreasonable because it's
not appropriate for the defendant, it's not appropriate to
the crime or because the sentencing range is too low or too
high, then I am to look to the statutory criteria that I
discussed with you a minute ago and come up with a sentence
that is reasonable and just under the circumstances.

What I'm going to ask Ms. Byrne now is what, if we
start with the Guidelines as a point of departure, what do
they tell us?

**MS. BYRNE:** Well, your Honor, I have to say
one thing before we get to that, which is that Mr. Arias is
pleading guilty to the indictment as it reads. The
indictment charges, as your Honor described, illegal reentry
after deportation. He's not pleading guilty to anything
regarding his criminal history. That's for another day, for

alien registration file as being Mr. Andujar-Arias, and

later he admitted that he, in fact, was Mr. Andujar-Arias

and he was born in the Dominican Republic.

A review of his file has indicated that he has not

received nor sought permission to reenter the United States,

either by the Attorney General prior to March 1st, 2003, or

the Secretary of the Department of Homeland Security

subsequent to that date.

THE COURT: Mr. Arias, putting aside the issue

of any prior convictions, the prosecutor says that you were,

in fact, previously deported after being given temporary

residence in the United States and that you did return

without the permission you were required to have.

Is that true?

THE DEFENDANT: Yes, sir.

THE COURT: Are you pleading guilty willingly,

freely and voluntarily?

THE DEFENDANT: Yes.

THE COURT: Has anyone coerced you in a

physical sense into pleading guilty?

THE DEFENDANT: No, sir.

THE COURT: Have any secret promises been made

to induce to you plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Have any threats been made, other

# EXHIBIT
# E

*Report to the Congress*:

# DOWNWARD DEPARTURES FROM THE FEDERAL SENTENCING GUIDELINES

(in response to section 401(m) of Public Law 108-21)



UNITED STATES SENTENCING COMMISSION
October 2003

the reason for departure involved plea agreements pursuant to Fed. R. Crim. P. 11(e)(1)(C).[131] Based on this figure the Commission estimates that sentencing courts cited binding plea agreements as the reason for departure in 1,788 cases in fiscal year 2001. Such plea agreements typically include agreements between the government and the defendant regarding sentencing ranges, maximum sentences, guideline calculations, and even precise sentence lengths, which, if the court accepts the plea agreement, are binding on the court.[132] The sentencing court granted a departure of the exact magnitude specified in 84.8 percent of the Rule 11(e)(1)(C) agreements reviewed for this analysis.

### 2.    PROTECT Act Remedy

The impact of plea agreements on the departure rate may decrease with enactment of the PROTECT Act. Pursuant to the directive to the Department of Justice contained in section 401(l) of the PROTECT Act, the Attorney General has told prosecutors that a recommendation for a particular sentence under Rule 11(c)(1)(B), or an agreement to a specific sentence under Rule 11(c)(1)(C) "must not vitiate relevant portions of the Sentencing Guidelines."[133]

Furthermore, subsequent to enactment of the PROTECT Act, the Attorney General issued a memorandum setting forth revised charging and plea bargaining policies requiring that any sentencing recommendation contained in a plea agreement, including departure recommendations, "be fully consistent with the Guidelines and applicable statutes and with the readily provable facts about the defendant's history and conduct."[134] Adherence to these new Department of Justice policies could affect a reduction in the incidence of downward departures.

### C.    EARLY DISPOSITION OR FAST TRACK PROGRAMS

Early disposition or fast track programs apparently account for a substantial portion of the government initiated downward departures discussed above. During its consideration of the PROTECT Act, Congress received correspondence attributing a substantial proportion of the

---

[131] Fed. R. Crim. P. 11(e)(1)(C) was redesignated as Fed. R. Crim. P. 11(c)(1)(C) in 2002.

[132] USSG §6B1.2 (Standards for Acceptance of Plea Agreements) provides that the court may accept a plea agreement that includes a specific sentence if the court is satisfied either that (1) the agreed sentence is within the applicable guideline range, or (2) the agreed sentence departs from the applicable guideline range for justifiable reasons.

[133] Ashcroft Appeals Memo, *supra* note 37, at 3.

[134] Ashcroft Charging Memo, *supra* note 40, at 5; *see supra* ch. 1, at pp. 10–16 (discussing Attorney General's memoranda).

downward departure rate to fast track programs established in judicial districts along the southwest border of the United States.[135]

## 1.    Impact of Increasing Immigration Offense Caseload

According to these submissions, fast track programs were established in judicial districts along the southwest border to accommodate burgeoning immigration offense and immigration related caseloads.[136] Commission sentencing data confirm that the number of federal immigration offenses increased dramatically from 2,300 in fiscal year 1991 to 10,458 in fiscal year 2001. *See* Figure 7. The increase in the number of immigration offenses has put enormous caseload pressures on the districts along the southwest border. The Southern District of California alone, for example, sentences more defendants under the guidelines (4,213) than do all of the district courts in each of the First Circuit (1,645), Second Circuit (4,147), Third Circuit (2,636), Seventh Circuit (2,450), Eighth Circuit (3,568), Tenth Circuit (3,415), and District of Columbia Circuit (276).[137]

The Commission is unable to estimate from its sentencing data the full impact of fast track programs with sufficient reliability for several reasons. Most important, sentencing courts do not report this information in a uniform manner. Courts in only one judicial district, the Southern District of California, typically cite "Fast Track" as a reason for downward departure on the Statement of Reasons.[138]

---

[135] *See e.g.,* Letter from Alfred P. Carlton, Jr., American Bar Association, to Sen. Orrin G. Hatch, Chairman, Committee on the Judiciary, United States Senate (Apr. 1, 2003), stating that the increased rate of nonsubstantial assistance departures is attributable to tripling of the number of departures in five fast track border districts from 1996 to 2001, *reprinted at* 149 CONG. REC. (daily ed. Apr. 10, 2003); Letter from Leonidas Ralph Mecham, Secretary, Judicial Conference of the United States, to Sen. Orrin G. Hatch, Chairman, Committee on the Judiciary, United States Senate (Apr. 3, 2003), attributing 70 percent of nonsubstantial departure increase to five southwest border districts, *reprinted at* 149 CONG. REC. S5121 (daily ed. Apr. 10, 2003); 149 CONG. REC. S5133–34 (daily ed. Apr. 10, 2003) (statement of Sen. Edward Kennedy, discussing letter from eight former United States Attorneys attributing increase in nonsubstantial assistance departure rate to southwest border districts).

[136] *Id.*

[137] Letter from Marilyn L. Huff, Chief Judge, United States District Court for the Southern District of California, to Judge Diana E. Murphy, Chair, United States Sentencing Commission 1 (Aug. 1, 2003) citing "recent published statistics" from the Commission indicating the Southern District of California sentenced more defendants under the guidelines than seven other circuits in their entirety.

[138] The Southern District of California accounted for 92.4 percent of departure cases citing fast track in fiscal year 2001.

The Commission's review of its sentencing data suggests that departures in other judicial districts that routinely cite "Pursuant to Plea Agreement"or "General Mitigating Circumstances" on Statement of Reasons may be fast track departures. For example, more than half (59.3%) of the downward departure cases citing general mitigating circumstances were sentenced in three districts on the southwest border: the Southern District of California (24.9%), the Western District of Texas (24.6%), and the District of Arizona (9.8%). In those three districts combined, 92.4 percent of the offenders receiving downward departures based on general mitigating circumstances were convicted of drug trafficking offenses (53.6%) or immigration offenses (38.8%), and 63.2 percent were non-U.S. citizens. These factors suggest that in those three districts general mitigating circumstances may be cited as a reason for departure in cases that in fact involve fast track dispositions.

Similarly, two districts on the southwest border, Arizona (54.3%) and New Mexico (21.9%), accounted for more than three-quarters of the downward departure cases citing "Pursuant to Plea Agreement." In those two districts combined, 94.7 percent of offenders receiving a downward departure pursuant to a plea agreement were convicted of an immigration offense (60.4%) or drug trafficking offense (34.3%), and 82.5 percent were non-U.S. citizens. These factors suggest that in those two districts plea agreements may be cited as a reason for departure in cases that in fact involve fast track dispositions.

Because of the difficulties in determining from Statements of Reasons the existence of a fast track departure, the Commission requested and the Department of Justice provided information regarding fast track programs so that the Commission could better interpret its data.[139] Included in the information provided were details regarding such programs in five judicial districts along the southwest border: the District of Arizona, the Southern District of California, the District of New Mexico, the Southern District of Texas, and the Western District of Texas.[140] Each of these southwest border districts reported that its fast track program was established in response to overwhelming caseloads, and such programs generally covered illegal reentry, alien smuggling, and certain drug trafficking offenses. The specific criteria and benefits to the defendants in each district, however, vary significantly.

---

[139] *See* Letter from Judge Diana E. Murphy, Chair, United States Sentencing Commission, to Larry D. Thompson, Deputy Attorney General, United States Department of Justice (May 13, 2003) requesting information on early disposition programs.

[140] *See* Letter from Eric Jaso, Counselor to the Assistant Attorney General, United States Department of Justice, to Judge Diana E. Murphy, Chair, United States Sentencing Commission (Aug. 1, 2003) [hereinafter Jaso Fast Track Letter] setting forth information on fast track programs. The Department of Justice also provided information regarding two additional districts, the District of Idaho and the Eastern District of Washington, that had established fast track programs for illegal reentry cases. The program was discontinued in the Eastern District of Washington in May 2002.



Figure 16
Trends in Downward Departure Rates
Fiscal Year 1991-Fiscal Year 2001

Southwest border districts include Southern California, Arizona, New Mexico, Western Texas, and Southern Texas.
SOURCE: U.S. Sentencing Commission 1991-2001 Datafiles, USSCFY1991-NEWUSSCFY2001.

Southwest border districts combined have experienced a significant increase in the departure rate from 10.2 percent in fiscal year 1991 to 38.2 percent in fiscal year 2001, an almost four-fold increase. *See* Figure 16. Furthermore, southwest border districts account for a disproportionate number of departures. The national departure rate was 18.1 percent in fiscal year 2001. If southwest border districts are excluded, however, the national departure rate has increased more modestly from 4.8 percent in fiscal year 1991 to 10.4 percent in fiscal year 2001. Therefore, fast track programs in districts along the southwest border appear to drive the national departure rate significantly higher than it otherwise would be.

2.    **Extent of Fast Track Programs**

Fast track programs apparently are not limited to the districts along the southwest border. The Department of Justice indicated that fast track programs exist in some form in up to one-half of the 94 judicial districts.[141] The widespread nature of fast track programs would suggest that

---

[141] *See* Letter from Judge Diana E. Murphy, Chair, United States Sentencing Commission, to Eric Jaso, Counselor to the Assistant Attorney General, United States Department of Justice (Aug. 25, 2003) requesting further clarification of fast track and early disposition programs.

factors in addition to the burgeoning number of immigration related offenses are the impetus for some of these programs.

Further complicating the analysis is the fact that the majority of fast track programs "do not employ agreed-upon or Government-requested downward departures, but instead rely upon accepting pleas to lesser charges."[142] As discussed in Chapter 2, the Commission generally compiles sentencing information regarding only the statutes of conviction and the sentencing guidelines applicable to those statutes, and, as a result, the Commission cannot estimate the impact of this type of fast track program.

In sum, data constraints and the apparent widespread use of a variety of early disposition programs across the nation prevent the Commission from isolating fast track departures from downward departures generally. Accordingly, the Commission cannot fully estimate the contribution of such programs to the increasing downward departure rate.

### 3.    Early Disposition Programs Pursuant to the PROTECT Act

Congress has recognized the importance of fast track or early disposition programs by sanctioning their use in section 401(m) of the PROTECT Act. Section 401(m) directs the Commission to promulgate "a policy statement authorizing a downward departure of not more than four levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney."[143] The underlying premise of fast track programs, as articulated by the Attorney General, is that defendants who promptly agree to participate in such a program save the government significant scarce resources that can be used in prosecuting other defendants and demonstrate acceptance of responsibility above and beyond what is taken into account under §3E1.1 (Acceptance of Responsibility).[144]

The Commission also received testimony underscoring the importance of fast track programs in certain judicial districts. The Chief Judge of the Southern District of California testified that, because of the overwhelming caseload in that district, in great part comprised of immigration related offenses, fast track programs are essential to the efficient and effective administration of the courts in that district.[145] Furthermore, the Commission received testimony from the United States Attorney from the District of Arizona that the fast track program in that

---

[142] See Jaso Fast Track Letter, *supra* note 140.

[143] Pub. L. 108-21, § 401(m)(2)(B), 117 Stat. 650 (2003).

[144] See *supra* ch. 1, at pp. 14–16.

[145] Written statement by Hon. Marilyn L. Huff, Chief Judge, United States District Court for the Southern District of California, to the United States Sentencing Commission regarding necessity of fast track or early disposition programs within the Southern District of California (Sept. 23, 2003).

district advances the statutory goal of deterrence, particularly regarding immigration offenses. Even with its fast track program, the United States Attorney stated that the District of Arizona can prosecute only a small fraction of the hundreds of thousands of illegal entries committed in that judicial district. In the absence of a fast track program, he stated that prosecutions of immigration offenses would significantly decrease, thereby reducing the deterrent effect of current prosecutorial practices.[146]

On September 22, 2003, the Attorney General issued a memorandum outlining the criteria for authorization of such programs.[147]  In order to receive authorization for a fast track program, a district must demonstrate, among other criteria, that (1) the district handles an exceptionally large number of a specific class of offenses within the district; (2) failure to handle such cases on an expedited basis would significantly strain prosecutorial and judicial resources in the district; and (3) state prosecution of such cases is either unavailable or unwarranted.[148] The memorandum, however, specifies no requirements regarding the type (*i.e.* downward departure or charge bargaining) or extent of the benefit to be received by a defendant pursuant to a fast track program, other than the statutory requirement that a benefit in the form of a departure not exceed four offense levels.[149]

The Department of Justice requested that the Commission implement the directive regarding the early disposition programs in section 401(m) of the PROTECT Act in a similar unfettered manner by merely restating the legislative language and "leav[ing] to the sentencing court the extent of the departure under these early disposition programs."[150]  The Commission notes that implementation of the directive in this manner has the potential to create unwarranted sentencing disparity.

The new statutory requirement that the Attorney General approve all early disposition programs hopefully will bring about greater uniformity and transparency among those districts that implement authorized programs.  Defendants sentenced in districts without authorized early disposition programs, however, can be expected to receive longer sentences than similarly-

---

[146] Written statement by Paul Charlton, United States Attorney, District of Arizona, to the United States Sentencing Commission regarding fast track programs in Arizona (Sept. 23, 2003).

[147] *See* Ashcroft Fast Track Memo, *supra* note 50.

[148] The criteria are discussed in more detail in ch. 1, at pp. 14–16.

[149] *See* Ashcroft Fast Track Memo, *supra* note 50.

[150] *See* Letter from Eric H. Jaso, Counselor to the Assistant Attorney General, U. S. Department of Justice, to Judge Diana E. Murphy, Chair, United States Sentencing Commission 19 (Aug. 1, 2003), submitting 18 U.S.C. §994(o) report commenting on the operation of the sentencing guidelines and requesting that the Commission "simply restate the legislative language" contained in the PROTECT Act regarding early disposition programs.

situated defendants in districts with such programs. This type of geographical disparity appears to be at odds with the overall Sentencing Reform Act goal of reducing unwarranted sentencing disparity among similarly-situated offenders.

Furthermore, sentencing courts in districts without early disposition programs, particularly those in districts that adjoin districts with such programs, may feel pressured to employ other measures – downward departures in particular – to reach similar sentencing outcomes for similarly situated defendants. This potential response by sentencing courts could undermine the goal of the PROTECT Act to reduce the incidence of downward departures.

Finally, sentencing courts within districts that establish authorized early disposition programs may not have sufficient guidance to apply the departure provision in a uniform manner. Without greater specifications to the sentencing court regarding the circumstances warranting an early disposition departure, and the appropriate extent of departure, sentencing courts may vary in their application of the policy statement. Such variation could result in undesirable sentencing disparity.

Accordingly, the Commission agrees with the Department of Justice's comment that "[i]t may be appropriate at some later date to review how these early disposition programs are actually being implemented and whether further guidance to the courts might be useful."[151]

## D.    ASSESSING DOWNWARD DEPARTURES IN A BROADER CONTEXT

Less than two-thirds of cases sentenced in fiscal year 2001 – 63.9 percent – were sentenced within the guideline sentencing range. *See* Figure 1. This represents a significant decrease since fiscal year 1991, when 80.7 percent of cases were sentenced within the guideline sentencing range. This decreased percentage of within guideline range sentences, however, reflects an increase in both the number of substantial assistance departures pursuant to §5K1.1 (Substantial Assistance to Authorities),[152] which are granted only pursuant to a government motion, and nonsubstantial assistance departures.

The substantial assistance departure rate increased from 11.9 percent in fiscal year 1991 to 17.3 percent in fiscal year 2001, and accounted for almost one half (48.1%) of all departures below the guidelines in fiscal year 2001. *See* Figure 1. When substantial assistance departures

---

[151] *Id.*

[152] Section 5K1.1 provides in pertinent part that "[u]pon motion of the government that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." *See also* 18 U.S.C. § 3553(e) (West Supp. 2003) (Limited authority to impose a sentence below a statutory minimum) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.").

67

Table 9

GUIDELINE DEPARTURE RATE BY PRIMARY OFFENSE CATEGORY
Fiscal Year 2003

National

| PRIMARY OFFENSE | TOTAL | SENTENCED WITHIN GUIDELINE RANGE | | SUBSTANTIAL ASSISTANCE DEPARTURE | | GOVERNMENT INITIATED DEPARTURE | | OTHER DOWNWARD DEPARTURE | | UPWARD DEPARTURE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n | % | n | % | n | % | n | % | n | % |
| TOTAL | 64,990 | 45,124 | 69.4 | 10,323 | 15.9 | 4,116 | 6.3 | 4,887 | 7.5 | 540 | 0.8 |
| Robbery | 1,470 | 1,082 | 73.6 | 215 | 14.6 | 17 | 1.2 | 135 | 9.2 | 21 | 1.4 |
| Drugs - Trafficking | 24,060 | 14,678 | 61.0 | 6,579 | 27.3 | 1,153 | 4.8 | 1,599 | 6.6 | 51 | 0.2 |
| Drugs - Simple Possession | 1,038 | 922 | 88.8 | 9 | 0.9 | 2 | 0.2 | 8 | 0.8 | 97 | 9.3 |
| Firearms | 6,445 | 4,968 | 77.1 | 783 | 12.1 | 88 | 1.4 | 521 | 8.1 | 85 | 1.3 |
| Larceny | 2,207 | 1,910 | 86.5 | 143 | 6.5 | 13 | 0.6 | 123 | 5.6 | 18 | 0.8 |
| Fraud | 6,864 | 5,136 | 74.8 | 1,090 | 15.9 | 57 | 0.8 | 502 | 7.3 | 79 | 1.2 |
| Embezzlement | 726 | 609 | 83.9 | 41 | 5.6 | 2 | 0.3 | 74 | 10.2 | 0 | 0.0 |
| Forgery/Counterfeiting | 1,214 | 984 | 81.1 | 149 | 12.3 | 11 | 0.9 | 62 | 5.1 | 8 | 0.7 |
| Immigration | 13,931 | 9,762 | 70.1 | 364 | 2.6 | 2,551 | 18.3 | 1,210 | 8.7 | 44 | 0.3 |
| Other Miscellaneous Offenses | 7,035 | 5,073 | 72.1 | 950 | 13.5 | 222 | 3.2 | 653 | 9.3 | 137 | 1.9 |

Arizona

| PRIMARY OFFENSE | TOTAL | SENTENCED WITHIN GUIDELINE RANGE | | SUBSTANTIAL ASSISTANCE DEPARTURE | | GOVERNMENT INITIATED DEPARTURE | | OTHER DOWNWARD DEPARTURE | | UPWARD DEPARTURE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n | % | n | % | n | % | n | % | n | % |
| TOTAL | 4,429 | 1,815 | 41.0 | 259 | 5.8 | 1,852 | 41.8 | 399 | 9.0 | 104 | 2.3 |
| Robbery | 26 | 14 | 53.8 | 4 | 15.4 | 2 | 7.7 | 5 | 19.2 | 1 | 3.8 |
| Drugs - Trafficking | 951 | 288 | 30.3 | 157 | 16.5 | 343 | 36.1 | 160 | 16.8 | 3 | 0.3 |
| Drugs - Simple Possession | 411 | 330 | 80.3 | 0 | 0.0 | 0 | 0.0 | 3 | 0.7 | 78 | 19.0 |
| Firearms | 140 | 87 | 62.1 | 12 | 8.6 | 21 | 15.0 | 16 | 11.4 | 4 | 2.9 |
| Larceny | 108 | 89 | 82.4 | 3 | 2.8 | 6 | 5.6 | 9 | 8.3 | 1 | 0.9 |
| Fraud | 80 | 47 | 58.8 | 19 | 23.8 | 3 | 3.8 | 10 | 12.5 | 1 | 1.3 |
| Embezzlement | 3 | 2 | 66.7 | 1 | 33.3 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Forgery/Counterfeiting | 18 | 13 | 72.2 | 2 | 11.1 | 0 | 0.0 | 2 | 11.1 | 1 | 5.6 |
| Immigration | 2,394 | 768 | 32.1 | 37 | 1.5 | 1,433 | 59.9 | 154 | 6.4 | 2 | 0.1 |
| Other Miscellaneous Offenses | 298 | 177 | 59.4 | 24 | 8.1 | 44 | 14.8 | 40 | 13.4 | 13 | 4.4 |

Of the 70,258 guideline cases, 5,268 cases were excluded due to one or more of the following reasons: no analogous guidelines (481), missing or indeterminable departure information (4,606) or missing primary offense category (578).

Of the 4,576 guideline cases from the District of Arizona, 147 cases were excluded due to one or more of the following reasons: no analogous guidelines (5), missing or indeterminable departure information (141) or missing primary offense category (17).

This data was collected prior to the issuance of AO Form 245B, Revision 12/03, which now provides specific entries for the sentencing court to indicate whether a departure was initiated by one of the parties. As a result, the Commission could not definitively determine the attribution for every case. However, based on a review of the available sentencing documentation by USSC legal staff the Commission believes that the overwhelming majority of the government initiated departures listed in this table are properly categorized. For a list of the reasons used in the category see Table 25 in the 2003 Sourcebook of Federal Sentencing Statistics.

SOURCE: United States Sentencing Commission, Office of Policy Analysis, 2003 Datafile, OPAFY03.

## Table 9

## GUIDELINE DEPARTURE RATE BY PRIMARY OFFENSE CATEGORY
### Fiscal Year 2003

### National

| PRIMARY OFFENSE | TOTAL | SENTENCED WITHIN GUIDELINE RANGE | | SUBSTANTIAL ASSISTANCE DEPARTURE | | GOVERNMENT INITIATED DEPARTURE | | OTHER DOWNWARD DEPARTURE | | UPWARD DEPARTURE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n | % | n | % | n | % | n | % | n | % |
| TOTAL | 64,990 | 45,124 | 69.4 | 10,323 | 15.9 | 4,116 | 6.3 | 4,887 | 7.5 | 540 | 0.8 |
| Robbery | 1,470 | 1,082 | 73.6 | 215 | 14.6 | 17 | 1.2 | 135 | 9.2 | 21 | 1.4 |
| Drugs - Trafficking | 24,060 | 14,678 | 61.0 | 6,579 | 27.3 | 1,153 | 4.8 | 1,599 | 6.6 | 51 | 0.2 |
| Drugs - Simple Possession | 1,038 | 922 | 88.8 | 9 | 0.9 | 2 | 0.2 | 8 | 0.8 | 97 | 9.3 |
| Firearms | 6,445 | 4,968 | 77.1 | 783 | 12.1 | 88 | 1.4 | 521 | 8.1 | 85 | 1.3 |
| Larceny | 2,207 | 1,910 | 86.5 | 143 | 6.5 | 13 | 0.6 | 123 | 5.6 | 18 | 0.8 |
| Fraud | 6,864 | 5,136 | 74.8 | 1,090 | 15.9 | 57 | 0.8 | 502 | 7.3 | 79 | 1.2 |
| Embezzlement | 726 | 609 | 83.9 | 41 | 5.6 | 2 | 0.3 | 74 | 10.2 | 0 | 0.0 |
| Forgery/Counterfeiting | 1,214 | 984 | 81.1 | 149 | 12.3 | 11 | 0.9 | 62 | 5.1 | 8 | 0.7 |
| Immigration | 13,931 | 9,762 | 70.1 | 364 | 2.6 | 2,551 | 18.3 | 1,210 | 8.7 | 44 | 0.3 |
| Other Miscellaneous Offenses | 7,035 | 5,073 | 72.1 | 950 | 13.5 | 222 | 3.2 | 653 | 9.3 | 137 | 1.9 |

### Massachusetts

| PRIMARY OFFENSE | TOTAL | SENTENCED WITHIN GUIDELINE RANGE | | SUBSTANTIAL ASSISTANCE DEPARTURE | | GOVERNMENT INITIATED DEPARTURE | | OTHER DOWNWARD DEPARTURE | | UPWARD DEPARTURE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n | % | n | % | n | % | n | % | n | % |
| TOTAL | 557 | 382 | 68.6 | 72 | 12.9 | 4 | 0.7 | 96 | 17.2 | 3 | 0.5 |
| Robbery | 10 | 5 | 50.0 | 1 | 10.0 | 0 | 0.0 | 4 | 40.0 | 0 | 0.0 |
| Drugs - Trafficking | 221 | 148 | 67.0 | 46 | 20.8 | 2 | 0.9 | 24 | 10.9 | 1 | 0.5 |
| Drugs - Simple Possession | 5 | 5 | 100.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Firearms | 59 | 42 | 71.2 | 2 | 3.4 | 0 | 0.0 | 14 | 23.7 | 1 | 1.7 |
| Larceny | 23 | 18 | 78.3 | 2 | 8.7 | 0 | 0.0 | 3 | 13.0 | 0 | 0.0 |
| Fraud | 72 | 47 | 65.3 | 10 | 13.9 | 1 | 1.4 | 14 | 19.4 | 0 | 0.0 |
| Embezzlement | 2 | 1 | 50.0 | 1 | 50.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Forgery/Counterfeiting | 11 | 6 | 54.5 | 1 | 9.1 | 0 | 0.0 | 4 | 36.4 | 0 | 0.0 |
| Immigration | 59 | 48 | 81.4 | 0 | 0.0 | 0 | 0.0 | 10 | 16.9 | 1 | 1.7 |
| Other Miscellaneous Offenses | 95 | 62 | 65.3 | 9 | 9.5 | 1 | 1.1 | 23 | 24.2 | 0 | 0.0 |

Of the 70,258 guideline cases, 5,268 cases were excluded due to one or more of the following reasons: no analogous guidelines (481), missing or indeterminable departure information (4,606) or missing primary offense category (578).

Of the 567 guideline cases from the District of Massachusetts, 10 cases were excluded due to one or more of the following reasons: no analogous guidelines (1), missing or indeterminable departure information (9) or missing primary offense category (1).

This data was collected prior to the issuance of AO Form 245B, Revision 12/03, which now provides specific entries for the sentencing court to indicate whether a departure was initiated by one of the parties. As a result, the Commission could not definitively determine the attribution for every case. However, based on a review of the available sentencing documentation by USSC legal staff the Commission believes that the overwhelming majority of the government initiated departures listed in this table are properly categorized. For a list of the reasons used in the category see Table 25 in the 2003 Sourcebook of Federal Sentencing Statistics.

SOURCE: United States Sentencing Commission, Office of Policy Analysis, 2003 Datafile, OPAFY03.

**Table 25**

## REASONS GIVEN BY SENTENCING COURTS FOR GOV'T INITIATED DEPARTURES BELOW THE GUIDELINE RANGE[1]
### Fiscal Year 2003

| REASONS FOR DEPARTURES BELOW THE RANGE [2] | Number | Percent |
|---|---|---|
| Pursuant to plea agreement | 2,969 | 67.7 |
| Fast track | 431 | 9.8 |
| Savings to government | 268 | 6.1 |
| Early plea | 243 | 5.5 |
| Deportation | 174 | 4.0 |
| Waiver of indictment and/or appeal | 146 | 3.3 |
| Other government motion | 54 | 1.2 |
| Global disposition | 47 | 1.1 |
| (5K3.1) Early Disposition Program (EDP) | 22 | 0.5 |
| Due to stipulations | 13 | 0.3 |
| Pursuant to binding plea agreement | 9 | 0.2 |
| Facilitated early release of material witness | 4 | 0.1 |
| Joint recommendation | 4 | 0.1 |
| Large number of immigration cases | 2 | 0.0 |
| **TOTAL** | **4,386** | **100.0** |

[1] The departure reasons in the table represent government initiated departures. This data was collected prior to the issuance of AO Form 245B, Revision 12/03, which now provides specific entries for the sentencing court to indicate whether a departure was initiated by one of the parties. As a result, the Commission could not definitively determine the attribution for every case. However, based on a review of the available sentencing documentation by USSC legal staff, the Commission believes that the overwhelming majority of the departure reasons listed in this table are properly categorized as government initiated departure and the overwhelming majority of the departure reasons listed in Table 25A are properly categorized as "other downward departures."

[2] Of the 70,258 cases, 4,121 had a government initiated departure below the guideline range. Departure reasons were available in 4,118 of these cases which cited 5,648 reasons for downward departure. This table provides an exhaustive list of reasons used to determine that the departure was government initiated. Additional reasons may have been cited by the court but are no documented in this table. Courts often provide multiple reasons for departure; consequently, the total number of downward departure reasons may exceed the number of cases with a downward departure. Cases with substantial assistance as a reason for downward departure were not included in this table. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2003 Datafile, USSCFY2003.

**Table 27**

## OFFENDERS RECEIVING DEPARTURES IN EACH PRIMARY OFFENSE CATEGORY[1]
### Fiscal Year 2003

| PRIMARY OFFENSE | TOTAL | SENTENCED WITHIN GUIDELINE RANGE | | DEPARTURES BELOW THE GUIDELINE RANGE[2] | | DEPARTURES ABOVE THE GUIDELINE RANGE[3] | |
|---|---|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent | Number | Percent |
| TOTAL | 64,990 | 45,124 | 69.4 | 19,326 | 29.7 | 540 | 0.8 |
| Murder | 76 | 50 | 65.8 | 18 | 23.7 | 8 | 10.5 |
| Manslaughter | 48 | 34 | 70.8 | 7 | 14.6 | 7 | 14.6 |
| Kidnapping/Hostage Taking | 54 | 43 | 79.6 | 10 | 18.5 | 1 | 1.9 |
| Sexual Abuse | 263 | 205 | 77.9 | 49 | 18.6 | 9 | 3.4 |
| Assault | 503 | 406 | 80.7 | 73 | 14.5 | 24 | 4.8 |
| Robbery | 1,470 | 1,082 | 73.6 | 367 | 25.0 | 21 | 1.4 |
| Arson | 78 | 59 | 75.6 | 18 | 23.1 | 1 | 1.3 |
| Drugs - Trafficking | 24,060 | 14,678 | 61.0 | 9,331 | 38.8 | 51 | 0.2 |
| Drugs - Communication Facility | 377 | 278 | 73.7 | 98 | 26.0 | 1 | 0.3 |
| Drugs - Simple Possession | 1,038 | 922 | 88.8 | 19 | 1.8 | 97 | 9.3 |
| Firearms | 6,445 | 4,968 | 77.1 | 1,392 | 21.6 | 85 | 1.3 |
| Burglary/B&E | 51 | 44 | 86.3 | 7 | 13.7 | 0 | 0.0 |
| Auto Theft | 138 | 92 | 66.7 | 44 | 31.9 | 2 | 1.4 |
| Larceny | 2,207 | 1,910 | 86.5 | 279 | 12.6 | 18 | 0.8 |
| Fraud | 6,864 | 5,136 | 74.8 | 1,649 | 24.0 | 79 | 1.2 |
| Embezzlement | 726 | 609 | 83.9 | 117 | 16.1 | 0 | 0.0 |
| Forgery/Counterfeiting | 1,214 | 984 | 81.1 | 222 | 18.3 | 8 | 0.7 |
| Bribery | 160 | 111 | 69.4 | 49 | 30.6 | 0 | 0.0 |
| Tax | 462 | 289 | 62.6 | 172 | 37.2 | 1 | 0.2 |
| Money Laundering | 791 | 475 | 60.1 | 310 | 39.2 | 6 | 0.8 |
| Racketeering/Extortion | 791 | 509 | 64.3 | 277 | 35.0 | 5 | 0.6 |
| Gambling/Lottery | 88 | 56 | 63.6 | 32 | 36.4 | 0 | 0.0 |
| Civil Rights | 65 | 43 | 66.2 | 21 | 32.3 | 1 | 1.5 |
| Immigration | 13,931 | 9,762 | 70.1 | 4,125 | 29.6 | 44 | 0.3 |
| Pornography/Prostitution | 778 | 599 | 77.0 | 144 | 18.5 | 35 | 4.5 |
| Prison Offenses | 355 | 299 | 84.2 | 48 | 13.5 | 8 | 2.3 |
| Administration of Justice Offenses | 952 | 691 | 72.6 | 244 | 25.6 | 17 | 1.8 |
| Environmental/Wildlife | 113 | 75 | 66.4 | 37 | 32.7 | 1 | 0.9 |
| National Defense | 19 | 9 | 47.4 | 10 | 52.6 | 0 | 0.0 |
| Antitrust | 12 | 8 | 66.7 | 4 | 33.3 | 0 | 0.0 |
| Food & Drug | 71 | 52 | 73.2 | 17 | 23.9 | 2 | 2.8 |
| Other Miscellaneous Offenses | 790 | 646 | 81.8 | 136 | 17.2 | 8 | 1.0 |

[1] Of the 70,258 cases, 5,268 were excluded due to one or both of the following reasons: missing primary offense (578) or missing/inapplicable departure information (5,087). Descriptions of variables used in this table are provided in Appendix A.

[2] Departures below the guideline range include §5K1.1 substantial assistance, government initiated departures (see Table 25 for reasons), and other downward departures (see Table 25A for reasons).

[3] See Table 24 for a list of departure reasons comprising this category.

SOURCE: U.S. Sentencing Commission, 2003 Datafile, USSCFY03.

# EXHIBIT F



16 Fed.Sent.R. 134                                                                                          Page 1

16 Fed.Sent.R. 134, 2003 WL 23475483 (Vera Inst.Just.)

**(Cite as: 2003 WL 23475483 (Vera Inst.Just.))**

C

Federal Sentencing Reporter
Volume 16, Number 2
December, 2003
*1 MEMORANDUM FROM ATTORNEY GENERAL JOHN ASHCROFT SETTING FORTH JUSTICE
DEPARTMENT'S "FAST-TRACK" POLICIES
SEPTEMBER 22, 2003

Editor's Note: Subsection (m)(2)(B) of the enacted Feeney Amendment mandated the
U.S. Sentencing Commission to promulgate a policy statement authorizing downward
departures of not more than 4 levels, based on a government motion ""pursuant to
an early disposition program authorized by the Attorney General and the United
States Attorney." In September 2003, the Attorney General delivered the following
memorandum to all federal prosecutors to establish Justice Department policies
concerning so-called "fast-track" departures.

Office of the Attorney General

Washington D.C. 20530

September 22, 2003

TO: All Federal Prosecutors

FROM: John Ashcroft, Attorney General

SUBJECT: Department Principles for Implementing an Expedited Disposition or
""Fast-Track" Prosecution Program in a District

Section 401(m)(2)(B) of the 2003 Prosecutorial Remedies and Other Tools to end
the Exploitation of Children Today Act ("PROTECT Act") instructs the Sentencing
Commission to promulgate, by October 27, 2003, a policy statement authorizing a
downward departure of not more than 4 levels "pursuant to an early disposition
program authorized by the Attorney General and the United States Attorney." Pub.
L. No. 108-21, § 401(m)(2)(B), 117 Stat. 650, 675 (2003). Although the PROTECT Act
requirement of Attorney General authorization only applies by its terms to
fast-track programs that rely on downward departures, the Memorandum I have issued
on "Department Policy Concerning Charging Criminal Offenses, Disposition of
Charges, and Sentencing" likewise requires Attorney General approval for any
"fast-track" program that relies upon "charge bargaining" -- i.e., a program
whereby the Government agrees to charge less than the most serious, readily
provable offense. This memorandum sets forth the general criteria that must be
satisfied in order to obtain Attorney General authorization for "fast-track"
programs and the procedures by which U.S. Attorneys may seek such authorization.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Fed.Sent.R. 134                                                                    Page 2

16 Fed.Sent.R. 134, 2003 WL 23475483 (Vera Inst.Just.)

**(Cite as: 2003 WL 23475483 (Vera Inst.Just.))**


[FN1]

I. Required Criteria for Attorney General Authorization of a "Fast-Track" Program

 Early disposition or "fast-track" programs are based on the premise that a
defendant who promptly agrees to participate in such a program has saved the
government significant and scarce resources that can be used in prosecuting other
defendants and has demonstrated an acceptance of responsibility above and beyond
what is already taken into account by the adjustments contained in U.S.S.G. §
3E1.1. These programs are properly reserved for exceptional circumstances, such as
where the resources of a district would otherwise be significantly strained by the
large volume of a particular category of cases. Such programs are not to be used
simply to avoid the ordinary application of the Guidelines to a particular class
of cases.

 **\*2** In order to obtain Attorney General authorization to implement a "fast track"
program, the United States Attorney must submit a proposal that demonstrates that
--
   (A) (1) the district confronts an exceptionally large number of a specific
class of offenses within the district, and failure to handle such cases on an
expedited or "fast-track" basis would significantly strain prosecutorial and
judicial resources available in the district; or
(2) the district confronts some other exceptional local circumstance with respect
to a specific class of cases that justifies expedited disposition of such cases;
   (B) declination of such cases in favor of state prosecution is either
unavailable or clearly unwarranted;
   (C) the specific class of cases consists of ones that are highly repetitive and
present substantially similar fact scenarios; and
   (D) the cases do not involve an offense that has been designated by the
Attorney General as a "crime of violence." See 28 C.F.R. § 28.2 (listing offenses
designated by the Attorney General as Acrimes of violence" for purposes of the DNA
collection provisions of the USA PATRIOT Act).
These criteria will ensure that "fast-track" programs are implemented only when
warranted. Thus, these criteria specify more clearly the circumstances under which
a fast-track program could properly be implemented based on the high incidence of
a particular type of offense within a district -- one of the most commonly cited
reasons for justifying fast-track programs. Paragraph (A)(2), however, does not
foreclose the possibility that there may be some other exceptional local
circumstance, other than the high incidence of a particular type of offense, that
could conceivably warrant "fast-track" treatment.

II. Requirements Governing United States Attorney Implementation of Fast-Track
Programs

 Once a United States Attorney has obtained authorization from the Attorney
General to implement a fast-track program with respect to a particular specified
class of offenses, the United States Attorney may implement such program in the
manner he or she deems appropriate for that district, provided that the program is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Fed.Sent.R. 134

<P ALIGN=JUST